# United States Court of Appeals
## For the First Circuit

Nos. 11-2252
     12-1362
     12-1363

RTR TECHNOLOGIES, INC. ET AL.,

Plaintiffs, Appellants/Cross-Appellees,

v.

CARLTON HELMING ET AL.,

Defendants, Appellees/Cross-Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Boudin,[*] Selya and Stahl,

Circuit Judges.

James C. Donnelly, Jr., with whom John T. McInnes, Amanda Marie Baer, and Mirick, O'Connell, DeMallie & Lougee, LLP were on brief, for plaintiffs.
Steven J. Bolotin, with whom Tory A. Weigand and Morrison Mahoney LLP were on brief, for defendants.

February 1, 2013

---

[*]Judge Boudin heard oral argument in this matter and participated in the semble, but he did not participate in the issuance of the panel's opinion. The remaining two panelists have issued the opinion pursuant to 28 U.S.C. § 46(d).

**SELYA**, **Circuit Judge**.  These appeals call to mind that the law normally ministers to the vigilant, not to those who sleep upon perceptible rights.  The tale follows.

These appeals trace their genesis to a suit brought by a Massachusetts corporation and its principals, citizens of Massachusetts, against their quondam accountant and his firm.  Their complaint alleged that the defendants negligently advised them to file amended corporate and personal tax returns that had the effect of substantially increasing the principals' tax liability and destabilizing the company.  The district court granted summary judgment in favor of the defendants but rejected their request for attorneys' fees.  Both sides appeal.  After careful consideration of a scumbled record, we leave the parties where we found them.

## I.  BACKGROUND

We briefly rehearse the facts in the light most favorable to the plaintiffs (who opposed summary judgment below).  See Rared Manchester NH, LLC v. Rite Aid of N.H., Inc., 693 F.3d 48, 50 (1st Cir. 2012).

RTR Technologies, Inc. (RTR or the company) is a subchapter S corporation, see 26 U.S.C. § 1361, which develops heating and ice-melting systems for the rail and mass transit industries.  Rosalie Berger is the company's owner and president.  Her husband, Craig, is the company's director of marketing and

sales.  At the times material hereto, Rosalie and Craig Berger filed joint income tax returns.

RTR commenced operations in 1994 and in that year began making "loans" to Rosalie Berger.  It continued doing so throughout the 1990s, even as the corporation itself received two loans backed by the United States Small Business Administration (SBA) totaling $725,000.

By the end of 2002, RTR's balance sheet reflected more than $1,000,000 in loans to Rosalie Berger and approximately $600,000 in overdue debts to its suppliers.  That fall, the company nearly collapsed in the economic downturn that followed the terrorist attacks of September 11, 2001; a major customer curtailed a $3,000,000 order and RTR proved unable to pay either its trade creditors or its taxes on a current basis.  In October 2002, the company sought help from the SBA, which extended a direct disaster loan of $687,500, subject to the condition that RTR not "make any distribution" or "any advance, directly or indirectly by way of Loan, gift, bonus or otherwise" to its principals, employees, or related entities.

The company did not adhere to this condition; yet, when it was unable to keep its loan payments current, it sought still more money from the SBA.  The SBA denied this request, explaining that RTR "continued to loan the principals funds" that "represent[ed] valuable financial resources which could have been

applied to the recovery effort following the disaster." The SBA did agree, however, to enter into a forbearance agreement with RTR, which among other conditions required the company to hire a turnaround manager.

In September of 2003 (about two months after the forbearance agreement), RTR retained Carlton Helming, a Connecticut-based certified public accountant, and his firm, Helming & Co. (a Connecticut professional services corporation). Although initially hired as a turnaround specialist, Helming eventually took over tax preparation for RTR and the Bergers as well.

Over the next two years, he grew increasingly concerned about RTR's balance sheet; he repeatedly told both Rosalie Berger and RTR's general manager that he doubted that the transfers to Rosalie Berger could be regarded as bona fide loans for tax purposes. To cure this problem, Helming recommended that RTR and the Bergers amend their 2002 corporate and personal tax returns to reclassify the approximately $1,000,000 at issue as income to Rosalie Berger. Irony is no stranger to the law: part of the reason why Helming wanted to amend the previous returns rather than simply change the tax treatment of the transfers going forward was to make it easier for RTR to bring a malpractice suit against its previous accountant.

Rosalie Berger was dismayed with Helming's advice and sought "second opinions" from two tax attorneys. One apparently provided little insight into the matter; the other at least partially shared Helming's concern. Nevertheless, Rosalie Berger eventually followed Helming's recommendation; amended 2002 corporate and personal tax returns were filed in December 2005 and January 2006, respectively.

The Internal Revenue Service (IRS) accepted the amended returns and issued a deficiency assessment in May 2006. Two months later, the IRS lodged a tax lien of more than $525,000 against the Bergers.

Over time, the Bergers paid more than $110,000 in additional taxes, interest, and/or penalties. The plaintiffs contend that the amended returns had other adverse consequences as well. Specifically, they point out that by reclassifying the transfers to Rosalie Berger as salary payments, the net profit previously reflected on RTR's books was transmogrified into a net loss of nearly $1,500,000. They posit that reporting such a loss prevented RTR from securing bid and performance bonds and, thus, not only put certain business opportunities beyond its reach but also destabilized the business financially.

Notwithstanding this loss of equilibrium, the plaintiffs continued to retain Helming as their accountant; he prepared their corporate and personal tax returns for 2003, 2004, and 2005. It

was not until 2008 that the plaintiffs replaced Helming with a new accountant, Edward Szwyd.

Rosalie Berger avers that she engaged Szwyd in part because she hoped that he would be able to reverse the amendment of the 2002 returns and reclassify RTR's transfers to her as loans. Szwyd agreed to adhere to this game plan and, in October 2008, RTR and the Bergers filed re-amended 2002 corporate and personal tax returns. The IRS accepted the re-amended returns and abated the lien and sundry penalties, although some state tax liability issues have yet to be resolved.

In October of 2009, the plaintiffs sued the defendants in a Massachusetts state court. They claimed that Helming's advice to amend the 2002 tax returns was negligent and that following it resulted in substantially increased tax liabilities and lost profits. Their six-count complaint charged malpractice, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, negligent misrepresentation, and unfair trade practices. The defendants, citing diversity of citizenship and the existence of a controversy in the requisite amount, removed the action to the federal district court. See 28 U.S.C. §§ 1332(a), 1441.

Following pretrial discovery, plethoric briefing, and oral argument, the district court granted summary judgment in favor of the defendants. RTR Techs., Inc. v. Helming, 815 F. Supp. 2d

411, 415 (D. Mass. 2011). The court concluded that the tort and contract claims were time-barred and that the unfair trade practices claim was deficient because it did not allege the requisite level of dishonesty, fraud, or deceit. See id. at 423-24, 434. The court subsequently denied the defendants' motion for attorneys' fees. These timely appeals ensued.

## II. DISCUSSION

We subdivide our analysis into three segments. We look to Massachusetts for the governing law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Rared Manchester, 693 F.3d at 52.

### A. Tort and Contract Claims.

We start with the question of timeliness. In the circumstances of this case, this question is confined to the plaintiffs' tort and contract claims (that is, all of the plaintiffs' claims except their unfair trade practices claim). Our review of the lower court's ruling is de novo. Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).

Generally speaking, the limitations period in Massachusetts is three years for tort claims, Mass. Gen. Laws ch. 260, § 2A, and six years for contract claims, id. § 2. But where, as here, claims sounding variously in tort and contract are premised on a common factual nucleus, the controlling principle is that "limitation statutes should apply equally to similar facts regardless of the form of proceeding." Hendrickson v. Sears, 310

N.E.2d 131, 132 (Mass. 1974). In harmony with this principle, the Massachusetts legislature has decreed that the three-year limitations period shall apply to all "[a]ctions of contract or tort for malpractice, error or mistake against . . . certified public accountants." Mass. Gen. Laws ch. 260, § 4. The conclusion is inescapable, therefore, that a three-year limitations period applies to the entirety of the tort and contract claims asserted here.[1]

The plaintiffs' primary argument is that their suit is timeous because their causes of action accrued less than three years before they sued. Typically, a plaintiff's cause of action accrues when she is injured. See, e.g., Flannery v. Flannery, 705 N.E.2d 1140, 1143 (Mass. 1999) (when contract is breached); Joseph A. Fortin Constr., Inc. v. Mass. Hous. Fin. Agency, 466 N.E.2d 514, 516 (Mass. 1984) (when tort occurs). Here, however, Helming's allegedly wrongful conduct occurred some three years and nine months before the suit was commenced: the amended 2002 corporate return was filed with the IRS in December 2005 and the amended 2002 personal return was filed with the IRS the next month. The most serious tax consequences followed hot on the heels of these filings

---

[1] In the district court, the plaintiffs argued that their tort and contract claims were somehow distinct and, thus, subject to separate three- and six-year limitations periods. On appeal, they appear to concede that the three-year limit set forth above governs both the tort and contract claims. Whether conceded or not, that is plainly the case.

and transpired more than three years before the commencement of suit: the IRS assessed a tax deficiency against the Bergers in May of 2006 and entered a tax lien on July 16, 2006.

In an effort to subvert the force of this chronology, the plaintiffs embrace the discovery rule. That rule, in its Massachusetts iteration, holds that a cause of action accrues, and the statute of limitations begins to run, when a plaintiff knows or reasonably should know that she may have been harmed by a defendant's conduct, even if the harm actually occurred earlier. See Bowen v. Eli Lilly & Co., 557 N.E.2d 739, 741 (Mass. 1990). The plaintiffs asseverate that they did not know — nor should they have known — that they had been harmed by the defendants' actions until August of 2008, when their new accountant (Szwyd) agreed to re-amend the 2002 returns and once again classify the transfers to Rosalie Berger as loans.

This asseveration has a certain appeal, at least in the abstract. "An accountant, like an attorney or a doctor, is an expert," whereas a client is not, and generally a client can neither "be expected to recognize professional negligence if he sees it" nor "be expected to watch over the professional or to retain a second professional to do so." Kennedy v. Goffstein, 815 N.E.2d 646, 648 n.9 (Mass. App. Ct. 2004) (quoting Hendrickson, 310 N.E.2d at 135) (internal quotation marks omitted). A plaintiff may be aware that her tax bill was high, her lawsuit was dismissed, or

her surgical recovery was painful, but not be "on notice that someone may have caused her injury." Bowen, 557 N.E.2d at 741. Absent some warning sign, people ordinarily are not expected to assume that undesirable outcomes are the result of negligent or otherwise wrongful acts or omissions attributable to their accountants, attorneys, or physicians.

But when we move from the abstract to the facts at hand, we are compelled to reject the plaintiffs' argument. The discovery rule properly pertains only to those plaintiffs whose injuries are "inherently unknowable." Patsos v. First Albany Corp., 741 N.E.2d 841, 846 & n.8 (Mass. 2001) (internal quotation marks omitted). A "plaintiff need not know the extent of the injury or know that the defendant was negligent for the cause of action to accrue." Williams v. Ely, 668 N.E.2d 799, 804 (Mass. 1996). She simply must know that she "sustained appreciable harm as a result of the [defendant's] conduct." Id. In other words, "the running of the statute of limitations is delayed while 'the facts,' as distinguished from the 'legal theory for the cause of action,' remain 'inherently unknowable' to the injured party." Catrone v. Thoroughbred Racing Ass'ns of N. Am., Inc., 929 F.2d 881, 885 (1st Cir. 1991) (quoting Gore v. Daniel O'Connell's Sons, 461 N.E.2d 256, 259 (Mass. App. Ct. 1984)).

In this instance, warning signs abounded. Moreover, the plaintiffs were aware of all the critical facts by July of 2006.

-10-

Helming had advised them to undertake a course of action that resulted in the entry of a tax lien of more than half a million dollars. At that point, both the plaintiffs' harm and the cause of that harm were pellucid, even if the precise claims that they could (and ultimately did) pursue against the defendants were not.

To be sure, this would be a different case if the plaintiffs believed all along that the prodigious lien that had been entered against them was an unavoidable consequence of complying with their tax obligations until Szwyd informed them otherwise. But the plaintiffs harbored no such sanguine belief. The record makes manifest that Rosalie Berger sought out Szwyd because she already believed — and had believed virtually from day one — that Helming's advice was wrong. She explained in her deposition that she contacted Szwyd because she "didn't agree with [amending the returns] to begin with." She added that she had signed the amended returns "under duress and it was very, very damaging to my company, and I thought to inquire [with] a professional [to see] if I had the privilege of re-amending."

This was not all. Rosalie Berger said at other points in her deposition that even before the IRS lodged its lien, she had concluded that Helming's advice to amend the returns was "poorly thought out" and "was probably some of the poorest advice I could have possibly taken." She further vouchsafed that, even though she was "not a tax professional," she "knew" that amending the returns

-11-

"was not the right approach." These statements leave no doubt but that the plaintiffs knew, before July of 2006, that re-amendment of the returns was a dicey proposition. What is more, there is nothing to suggest that, between July of 2006 and October of 2009, any new and material information came to their attention.

If more were needed, we note that Rosalie Berger's disagreement with Helming's advice was so profound that Szwyd was the third professional from whom she sought another opinion. As recounted above, she had obtained advice from two other (independent) tax professionals even before signing the amended returns.

The knowledge possessed by Rosalie Berger and evidenced by her statements and actions is more than enough to render the discovery rule inapposite. The ultimate arbiter of Massachusetts law, the Supreme Judicial Court (SJC), previously addressed a strikingly similar situation. It held that a client could not invoke the discovery rule to toll the statute of limitations on a negligence claim against his former attorneys beyond the date on which he had concluded that they "didn't know what they were doing." Lyons v. Nutt, 763 N.E.2d 1065, 1069 (Mass. 2002) (internal quotation marks omitted); see Frank Cooke, Inc. v. Hurwitz, 406 N.E.2d 678, 684 (Mass. App. Ct. 1980) (explaining that the discovery rule does not apply beyond the time when plaintiff was informed that "defendant was not competent to render investment

-12-

advice").  In diversity jurisdiction, we are bound to accept state substantive law as formulated by the state's highest court, see Rared Manchester, 693 F.3d at 54, and there is no justification for us to apply the discovery rule more liberally than did the SJC in Lyons.

The plaintiffs try to attack the district court's resolution of the timeliness question from a number of angles. Their attacks generate more heat than light.

To begin, the plaintiffs maintain that summary judgment was inappropriate because a Massachusetts court has observed that the accrual date of a malpractice action against a tax preparer is a question of fact rather than a question of law.  See Kennedy, 815 N.E.2d at 650.  The cited statement, however, presupposes that the plaintiff has proffered evidence sufficient to create a genuine issue of material fact anent the accrual date.  See Doe v. Creighton, 786 N.E.2d 1211, 1214 (Mass. 2003) (holding that, even though the discovery rule typically raises fact issue, summary judgment is properly granted where the plaintiff did not "demonstrate a reasonable expectation of proving that her suit was timely filed").  Here, the facts show with conspicuous clarity that the plaintiffs knew of the claimed error, its cause, and the resulting harm more than three years before they sued.

Next, the plaintiffs contend that the district court erred in suggesting that their causes of action accrued even before

-13-

the amended returns were filed.[2]  But the plaintiffs are tilting at windmills; whatever the merits of the district court's suggestion — a matter on which we take no view — that suggestion is superfluous.   What counts is the court's conclusion that the plaintiffs' causes of action accrued no later than July 16, 2006. Whether or not they may have accrued earlier is of no moment.  See Houlton Citizens', 175 F.3d at 184.

The plaintiffs' final foray is an attempt to spin Rosalie Berger's consultations with independent experts in their favor.  In the last analysis, this amounts to little more than a Rumpelstiltskin-like endeavor to turn straw into gold.

Along these lines, the plaintiffs argue that the statute of limitations is tolled when a plaintiff acts diligently in retaining an expert to search for an injury and the expert fails to detect it.   This argument misreads our decision in Cambridge Plating Co. v. Napco, Inc., 991 F.2d 21 (1st Cir. 1993), which stands for the proposition that the mere hiring of an expert does not automatically start the limitations clock.  See id. at 26-27. The decision does not stand for the materially different proposition that an expert's failure to discover an error automatically tolls the limitations period.  The latter proposition

---

[2] On this point, the court adverted to late 2005, when Rosalie Berger acted on her strong conviction that Helming's advice was incorrect and solicited the opinions of other tax professionals. See RTR Techs., 815 F. Supp. 2d at 421.

-14-

is untenable. Cf. United States v. Kubrick, 444 U.S. 111, 124 (1979) (holding, under Federal Tort Claims Act, that if a plaintiff is incorrectly advised that he does not have a claim, that advice does not toll the statute of limitations). To be sure, Cambridge Plating contemplates tolling the limitations period when a plaintiff acts diligently in hiring a competent expert who nonetheless fails to discover the problem. See 991 F.2d at 27. But a sharp distinction exists between that case and this one. The Cambridge Plating plaintiff knew only that there was a problem (malfunctioning equipment) but did not know either the cause (a missing part) or who (if anyone) was at fault. See id. at 23, 29. Here, however, the plaintiffs were aware of both their putative injury (the tax liability) and its putative cause (Helming's advice to amend the returns). Cambridge Plating is, therefore, inapposite.

To sum up, we endorse the conclusion reached by the district court in its thoughtful opinion and hold that a three-year statute of limitations applies to bar the maintenance of the plaintiffs' tort and contract claims. Given this conclusion, we need not consider the parties' extensive quarreling about other issues bearing upon these claims.

**B. Unfair Trade Practices Claim.**

We turn next to the unfair trade practices claim. The relevant statute creates a cause of action in favor of those who

are engaged in "any trade or commerce and who suffer[] any loss of money or property" due to the "unfair or deceptive act or practice" of "another person who engages in any trade or commerce."  Mass. Gen. Laws ch. 93A, § 11.  Claims of this genre are subject to a four-year limitations period.  See id. ch. 260, § 5A.  So the plaintiffs' unfair trade practices claim is not time-barred.

The district court jettisoned this claim on the ground that the plaintiffs had failed to show negligence, to say nothing of the greater degree of wrongfulness the statute requires.  See RTR Techs., 815 F. Supp. 2d at 434; see also Poly v. Moylan, 667 N.E.2d 250, 257 (Mass. 1996) (explaining that chapter 93A demands a showing of "dishonesty, fraud, deceit or misrepresentation" (internal quotation marks omitted)).

Here, too, we review the entry of summary judgment. Accordingly, our review is de novo.  Houlton Citizens', 175 F.3d at 184.  In that exercise, we are not wedded to the district court's reasoning but, rather, may affirm on any ground revealed by the record.  Id.  We take that approach here; in our judgment, the chapter 93A claim fails for a reason even more fundamental than that assigned by the district court.

While "an element of uncertainty is permitted in calculating damages," Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 788 N.E.2d 522, 543 (Mass. 2003) (internal quotation marks omitted), damages nonetheless "must be proved and not left . . . to

-16-

speculation," Snelling & Snelling of Mass., Inc. v. Wall, 189 N.E.2d 231, 232 (Mass. 1963); accord Air Safety, Inc. v. Roman Catholic Archbishop of Bos., 94 F.3d 1, 4 (1st Cir. 1996). In this case, the federal tax lien has been abated, the penalties rescinded, and the status quo ante has been restored.[3] Moreover, the plaintiffs have adduced no evidence showing that the defendants' advice increased their tax liability above what they will owe once Szwyd fully accounts for reconverting the transfers into loans.

Indeed, the plaintiffs have left this question mired in doubt. At the time of the summary judgment ruling, Szwyd had re-amended the 2002 returns but had not amended the returns for the following years. And at oral argument in this court, the plaintiffs conceded that no other corporate or personal amended returns exist "for purposes of this record."

No matter how loudly bruited, the plaintiffs' insistence that Helming created significant tax liability does not suffice to fill this void. The existence of a tax deficiency, without more, is not a reliable measure of damages attributable to allegedly erroneous tax advice. See Miller v. Volk, 825 N.E.2d 579, 582 (Mass. App. Ct. 2005); see also Thomas v. Cleary, 768 P.2d 1090,

_____

[3] Although the plaintiffs' Connecticut state tax liability has yet to be resolved, they offer no suggestion as to why the payments they have made will not be refunded, and their temporary uncertainty hardly constitutes injury.

1091 n.5 (Alaska 1989); Lien v. McGladrey & Pullen, 509 N.W.2d 421, 426 (S.D. 1993); cf. Frank Cooke, 406 N.E.2d at 685-86 (explaining that even though an accountant may have been negligent in not reporting the "doubtful collectibility" of a loan, the loan was worthless at the time and, thus, the accountant was not liable). Here, the plaintiffs have not shown how their situation, over time, would have been improved in the absence of the amendment urged by Helming.

In the district court, the plaintiffs tried to backfill the record by moving to file a "sur reply" that included proposed tax returns for the years in question, related affidavits, and a set of charts. The district court denied this motion as insufficient and untimely. The plaintiffs have not challenged this ruling on appeal. Consequently, the proffered exhibits are not entitled to any weight. See Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 31-32 (1st Cir. 2004); EEOC v. Green, 76 F.3d 19, 24 (1st Cir. 1996).

Instead, the plaintiffs suggest in this court that one of their experts concluded that alternatives to Helming's approach would have resulted in lower tax liability and that this conclusion creates a factual issue for trial. This suggestion comprises more cry than wool. In the absence of tax returns to support the expert's conclusion — and the record contains none — the district court did not err in declining to credit the expert's view.

"[E]xpert testimony may be more inferential than that of fact witnesses," but "an expert opinion must be more than a conclusory assertion about ultimate legal issues" in order to thwart a motion for summary judgment. Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 92 (1st Cir. 1993). It is possible that Szwyd's approach might result in a lighter overall tax burden — but in the absence of an alternative set of tax calculations, factually supported, that possibility is entirely conjectural. To forestall the entry of summary judgment, the law requires more than arguments woven from the gossamer strands of speculation and surmise.

With respect to the other claimed damages (such as lost profits), the plaintiffs' evidence is patently inadequate. Their expert report estimating such lost profits hinges entirely on conclusory statements such as, "[b]ut for the actions of Helming, RTR would have been able to obtain the required bonding to win [certain] contracts" and "[b]ut for the actions of Helming, RTR would have been the Prime Contractor for these contracts." The district court appropriately refused to credit these bald assertions. See id.; see also Bowen v. City of Manchester, 966 F.2d 13, 18 n.16 (1st Cir. 1992) ("[S]ummary judgment cannot be defeated by an expert's conclusory assertion about ultimate legal issues." (internal quotation marks omitted)).

## C.  **The Cross-Appeal**.

This brings us to the defendants' cross-appeal, which challenges the district court's denial of attorneys' fees.  The defendants had invited the district court to award such fees pursuant to its inherent powers, but the court declined the invitation.  RTR Techs., Inc. v. Helming, No. 09-30189, 2012 WL 601913, at *1-2 (D. Mass. Feb. 22, 2012).

Although under the American Rule "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser," Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975), federal courts have the power to award such fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," id. at 258-59 (internal quotation marks omitted).  Invoking this standard, the defendants sought fees for what they termed the plaintiffs' "bad faith conduct" in pursuit of "a meritless action."

The district court largely agreed with the defendants' characterization of the plaintiffs' conduct.  The court described the plaintiffs' behavior as "disturbing," their decision to bring the suit itself as "profoundly ill-advised," and their "temerity" in doing so as "surprising" given that their claims were "close to ludicrous."  The court concluded, however, that the circumstances were not sufficiently outrageous to justify a fee award.

District courts are well-advised to use their inherent power cautiously and to grant attorneys' fees sparingly under that power. See, e.g., Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991); Estate of Hevia v. Figueroa-Marrero, 602 F.3d 34, 46 (1st Cir. 2010). We think it follows logically that battles over the appropriateness of denials of attorneys' fees under that power will customarily be won or lost in the district court. This case illustrates why.

The defendants admittedly presented a credible argument for fees. Our review, however, is only for abuse of discretion. FDIC v. Kooyomjian, 220 F.3d 10, 16 (1st Cir. 2000). The district court's discretion is broad and, in this instance, the court adequately explained its determination not to award fees. The court concluded that affidavits and other materials submitted by the plaintiffs describing their efforts to investigate their claims were "sufficient (though barely)" to defeat the fees motion.

The defendants have not persuasively described how this decision constitutes an abuse of discretion, which occurs when there is an error of law or "when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." United States v. One Star Class Sloop Sailboat, 546 F.3d 26, 37 (1st Cir. 2008) (internal quotation marks omitted). In the absence of such a

showing, the district court's determination stands as "a judgment call which we decline to second-guess." <u>Haddad Motor Grp., Inc.</u> v. <u>Karp, Ackerman, Skabowski & Hogan, P.C.</u>, 603 F.3d 1, 11 (1st Cir. 2010).

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, we reject these appeals.  All parties shall bear their own costs.

**Affirmed.  No costs**.